BERT ARMBRUSTER ET AL., APPELLANTS AND CROSS-APPELLEES, v. STANTON-PILGER DRAINAGE DISTRICT, APPELLEE AND CROSS-APPELLANT.

100 N. W. 2d 781

Filed January 15, 1960.   No. 34614.

*R. M. Mueting* and *R. J. Shurtleff*, for appellants.

*Thomas L. Grady*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and BOSLAUGH, JJ.

CHAPPELL, J.

This case is here on appeal a second time. Our former opinion is reported as Armbruster v. Stanton-Pilger Drainage Dist., 165 Neb. 459, 86 N. W. 2d 56. Therein plaintiffs, Bert Armbruster and Irene Armbruster, his wife, appealed, and we reversed the judgment of the trial court which had dismissed plaintiffs' amended and supplemental petition on motion of defendant, Stanton-Pilger Drainage District, at conclusion of plaintiff's case. We then remanded the cause for new trial. Plaintiffs' action sought a mandatory injunction and damages against defendant. Hereinafter, when referring to Bert Armbruster alone he will be called plaintiff, and when referring to both plaintiffs, they will be so designated.

Except on the issues of plaintiffs' alleged release of their claim for damages and their alleged estoppel to claim the same, this appeal will be considered in the light of the applicable and controlling rules appearing in Snyder v. Lincoln, 156 Neb. 190, 55 N. W. 2d 614, which held that: "When this court determines the law of the case on appeal, the trial court is bound thereby and its judgment in accordance therewith will not ordinarily be disturbed on a subsequent appeal." Generally, however, if other and different issues of fact and of law relating thereto have been properly adduced and presented in a new trial, the law of the case is not controlling thereof in a subsequent appeal. It would serve no useful purpose here to restate the determined rules of law which appear in our first opinion as syllabus points 2 to 8 inclusive. The entire record, including all evidence adduced by plaintiffs at the first trial together with all evidence adduced by the parties at the new trial, is now before this court for consideration.

To clarify the situation, we point out that this case involved the alleged interference with and diversion by defendant of waters flowing in a small natural stream known as Cedar Creek, hereinafter called the creek,

which caused damages to plaintiffs' land by erosion of said creek. In that connection, it is undisputed that prior, during, and subsequent to 1950, plaintiffs were joint owners of the north half of a described section of land in Stanton County. Prior to 1950, the creek entered plaintiffs' land from the south at a point near the southeast corner, then flowed 3,960 feet north and northwest, then left plaintiffs' land at their north line under a county bridge which spanned the creek on an east and west county road, thence flowed on north over land of another and emptied into the Elkhorn River, which flowed generally from east to west in a meandering course about 2,200 feet north of plaintiffs' north line.

It was stipulated as follows: That a petition to form defendant district under the provisions of sections 31-401 to 31-450, R. R. S. 1943, inclusive, was filed August 19, 1949. It was signed by 12 named persons other than plaintiffs. The same day a statutory bond was filed which was signed by all such named persons except one. On October 11, 1949, five named directors other than plaintiffs were elected, who all continued to serve defendant as such for more than 5 years thereafter. On October 24, 1949, such directors instructed defendant's engineer, theretofore employed by them, to prepare detailed plans, specifications, and cost estimates for the construction of a pilot channel, hereafter called ditch, with which to straighten the channel of the Elkhorn River. On February 9, 1950, such plans, specifications, and cost estimates were presented to defendant's directors, who approved and adopted a proposed plan which provided for the construction of a ditch 34 feet wide at the top, 24 feet wide at the bottom, and 10 feet deep, with a right-of-way 100 feet wide on each side, and such plans were left at all times thereafter in the custody of defendant's lawyer. In that connection, it is undisputed that no part of plaintiffs' land was within the boundaries of the district except plaintiffs' described northwest 40 acres, and plaintiffs' land, through which

the creek flowed and on which damages directly occurred by erosion, was entirely outside the boundaries of the district.

The record discloses that in 1950 defendant constructed the ditch over right-of-way acquired by it for the purpose of straightening the Elkhorn River channel and to provide for the passage of waters which would otherwise have flowed through the old Elkhorn River channel. The ditch was constructed from west to east and then from east to west until it intersected or cut across the channel of the creek on land of another about 990 feet north of plaintiffs' north line. The ditch, which was completed by defendant in November or December 1950, was cut about 6 feet below the base or bed of Cedar Creek and the Elkhorn River, which created a waterfall 6 feet high where defendant's ditch intersected the creek, and the water therefrom emptied into the ditch. The evidence is conclusive that thus such waterfall created by defendant naturally and directly caused the channel of the creek to substantially erode upstream in the creek, thus deepening and widening the creek and continuing to do so until it reached and entered plaintiffs' land, and, as hereinafter observed, caused and continued to cause substantial and irreparable damage to plaintiffs' land and the use thereof, and to plaintiffs' improvements and structures on their land.

Before such erosion caused by the waterfall had reached plaintiffs' land, and before any material damage had been caused on their land, plaintiffs notified defendant of the apparent progressive damage which had already manifested itself on the land of another north of plaintiffs. However, although there were and are standard, practical, feasible, and effective structures, means, and methods by which defendant could have built and thereby arrested and prevented the damage to plaintiffs which naturally ensued, occurred, has continued, and will continue to occur through all 3,960 feet of plaintiffs' land unless prevented, defendant has

failed and refused to employ any such means or methods. On June 27, 1952, before damages had occurred on plaintiffs' land, they filed an original petition against defendant, praying for a mandatory injunction and requiring defendant to build some such structure in the bed and channel of the creek to prevent further erosion to and upon plaintiffs' land. While such action was pending, the waterfall had eroded into plaintiffs' land for some distance, deepening, widening, and eroding the bed and banks of the creek and causing substantial and irreparable damage to plaintiffs' land and the use thereof, and to some improvements and structures on plaintiffs' land.

In the meantime, about August 25, 1952, plaintiffs consulted with and employed an engineer, and, as advised by him, plaintiffs expended some $7,267.74 in the respective construction of three separate piling structures in the creek on plaintiffs' land, thereby attempting to prevent further erosion and damages, but each of such structures eventually washed out during heavy rains and failed to stop the continued erosion. Plaintiffs had also expended substantial sums to protect, remove, or repair the property and improvements on their land which had been damaged or were threatened by the erosion. There is some evidence by plaintiffs' engineer that the piling structures built by plaintiffs' contractor, who was admittedly competent, failed to function as they should and would have done, because plaintiffs did not follow the engineer's instructions and have enough concrete placed in the bed of the creek below the piling. However, such evidence was a mere conclusion, of doubtful credibility as we view it, because in making an inspection he made no attempt to determine, and admittedly never knew, how much concrete plaintiffs did have placed below the structure. In any event, the structures washed out substantially around the ends of the piling and not below the piling. In such respect, plaintiff testified positively that he fol-

lowed his engineer's instructions and expended such sums in good faith, which is the important factor to be considered here because, as hereinafter observed, plaintiffs could not recover such sums as such in any event.

Be that as it may, on July 2, 1953, plaintiffs filed an amended and supplemental petition, hereinafter called petition, repeating and elaborating upon the allegations of their original petition and seeking both a mandatory injunction and damages. Thereafter, on January 28, 1954, defendant filed an answer denying generally and alleging as a defense that plaintiffs never filed with the secretary of defendant's board of directors any notice of their claimed damages within 30 days after they occurred, as provided by section 31-451, R. R. S. 1943. Defendant then prayed for dismissal of plaintiffs' petition. However, thereafter, on November 16, 1955, defendant filed an amended answer renewing its previous allegations and also alleging as a defense that on July 13, 1950 (which, it will be noted, was before the ditch had been constructed or any damage to plaintiffs was threatened or had occurred), plaintiffs allegedly satisfied and released defendant from all damages, present and future, sustained by them, arising or growing out of construction of the ditch, whether plaintiffs' damages were caused by negligence of defendant or otherwise. A copy of said release, admittedly signed by plaintiffs on July 13, 1950, was attached to and made a part of defendant's amended answer. Defendant then renewed its prayer for dismissal.

It is well here to say that such release provided in substance that for a consideration of $9.20 plaintiffs granted defendant the authority to construct and perpetually maintain such ditches or drains as necessary or expedient for the purpose of straightening or altering the then course of the Elkhorn River or providing a system of drainage within said district for surface or running water over and upon a part of plaintiffs' particu-

larly-described northwest 40 acres heretofore mentioned, which was within the district but through which the creek never flowed. The release then went on to grant defendant perpetual authority "upon the above described premises" to cut, remove, or destroy all trees or bushes growing or being within a distance of 100 feet of the center line of any ditch constructed or excavated by defendant or of the center line of the Elkhorn River "where the course of such river remains unchanged" (and it did remain unchanged) which, as hereinafter observed, ran through an unused ninety-two hundredths of an acre, entirely located in said 40 acres between the county road and plaintiffs' extreme northwest corner of said 40 acres. The release also gave defendant perpetual authority within the area where the trees or brush might be destroyed, to construct and maintain such dikes, levees, or dams as might be deemed necessary by defendant. The release then agreed that the $9.20 consideration was received by plaintiffs in full settlement and satisfaction for all damages, present and future, "to the above described premises or to any other premises owned by either of us within the boundaries of said Drainage District, or damage otherwise sustained by either of us, arising or growing out of the construction, excavation, or maintenance of ditches, drains, dikes, levees, or dams upon the above described premises *or upon other lands in said Drainage District*," whether such damage arose because of the negligence of defendant in the construction and maintenance of such works of improvement or otherwise. (Italics supplied.) In that connection, defendant relies solely upon the above-quoted obscure italicized language. It will be noted that the release refers repeatedly to "upon the above described premises" which was a part of plaintiffs' described 40 acres, the only portion of plaintiffs' land "within the boundaries of said Drainage District." It is apparent to us that unless plaintiffs, as reasonably intelligent persons, were

particularly informed and warned or knew that the language "or upon other lands in said Drainage District," meant that they thereby also released all damages, present and future, to their land, it would not and could not be so reasonably understood.

On December 12, 1955, plaintiffs filed a reply traversing defendant's allegations that plaintiffs had failed to comply with section 31-451, R. R. S. 1943. In such respect, plaintiffs alleged that they had complied therewith at their earliest known opportunity and that same was not required in any event to recover under the provisions of Article I, section 21, Constitution of Nebraska. With regard to plaintiffs' alleged satisfaction and release of damages, plaintiffs denied generally and alleged in substance that they did not know or realize and had never been informed by defendant, as it had the duty to do, that the proposed ditch would cut below the bed of the creek and thereby create a waterfall which would cause the creek to erode upstream and damage plaintiffs' land outside the district in any respect; that the threatened damage to plaintiffs' land was not apparent or known to them for a considerable time after the ditch had been constructed; that at the time plaintiffs signed said release, they did not know or intend, and were not informed that for a nominal and greatly inadequate consideration of $9.20, they were releasing any damages they might sustain by diversion of the creek from its bed or channel and such was not within the contemplation of either plaintiffs or defendant; that there was either a mutual mistake, or defendant overreached plaintiffs and took or seeks to take an unfair and unjust advantage of plaintiffs' ignorance of facts then existing; and that equity should not relieve defendant from its unlawful acts and negligence by enforcing said release. Plaintiffs also alleged that at and prior to the signing of said release, the Elkhorn River ran through about an acre located in the extreme northwest corner of plaintiffs' 40 acres heretofore mentioned

and described in the release, and plaintiffs were informed by defendant that the purpose of the release was to secure an easement for right-of-way over ninety-two hundredths of an acre located in said corner, for which plaintiffs were offered and paid $9.20 on the basis of $10 an acre, the amount per acre which defendant paid to others granting such an easement. Plaintiffs then renewed the prayer of their petition.

In that connection, it was stipulated that on August 26, 1950, which it will be noted was before construction of the ditch and before plaintiffs were damaged or threatened with any damage, the directors allowed some bills and ordered warrants for their payment, among which was one to plaintiffs "Bert Armbruster and Irene Armbruster, easement for right-of-way $9.20." In that connection, we point out here that defendant's own engineer, in testifying at the second trial about the claimed erosion and damages to plaintiffs, testified that they didn't anticipate it doing what it had done; never dreamed of it; and never expected it to do that. Also, one of defendant's directors testified that he never knew how deep the bed of the creek was to be cut. Another testified that he never was warned that there might be erosion and trouble in the creek if the cutoff was made through there. Another testified that they did not know and could not foresee what would happen, and that he was never warned that such a situation would be created in the creek. At this point, it is well to say that plaintiffs' evidence established the relevant and material allegations of their reply by a great preponderance of the evidence.

The first trial began on December 12, 1955, and proceeded at designated intervals until September 12, 1956, when plaintiffs rested and defendant moved for dismissal, and on November 28, 1956, the trial court rendered a judgment sustaining defendant's motion and dismissing plaintiffs' petition. Thereafter, on April 6, 1957, plain-

tiffs' motion for new trial was overruled, and they appealed.

Our opinion, Armbruster v. Stanton-Pilger Drainage Dist., *supra,* filed November 15, 1957, summarized the factual situation adduced by plaintiffs as declared in their petition. Our opinion concluded that plaintiffs' cause of action was sustained by plaintiffs' evidence, that is, that plaintiffs had proved the acts charged against defendant and plaintiffs were thereby damaged. Citing authorities, we concluded that plaintiffs had stated a cause of action, which, if sustained by evidence, would entitle them to a mandatory injunction, and that the evidence adduced was prima facie sufficient, to prove their right to such relief. Citing other authorities, we also concluded that plaintiffs' right of action, based on Article I, section 21, Constitution of Nebraska, was not barred by failure to give the notice provided by section 31-451, R. R. S. 1943; that plaintiffs' cause of action for damages could be and was properly joined with one for equitable relief; and that plaintiffs' evidence was prima facie sufficient to sustain a recovery of damages. In the light thereof, we reversed the judgment and remanded the cause for new trial.

On June 30, 1958, judgment on the mandate was rendered by the trial court, which granted a new trial; retained the cause on the trial docket in order to proceed in conformity with the judgment and mandate of this court; and ordered plaintiffs to recover from defendant the costs of appeal. Thereafter, on December 22, 1958, with leave of court, defendant filed an amendment to its amended answer alleging that plaintiff, having actively participated in the location and construction of defendant's ditch, and plaintiffs having executed the release aforesaid, they were estopped to assert any claim for damages against defendant.

On December 22, 1958, the new trial was resumed as if plaintiffs' reply were a reply to defendant's answer as amended. Thereat, plaintiffs were permitted to with-

draw their previous rest. Whereupon all evidence adduced by them at the first trial was offered and received; they adduced additional evidence with regard to the condition of their land and additional damages sustained by them since the first trial; defendant adduced evidence in support of its amended answer; and plaintiffs offered evidence in rebuttal. Thereafter, on January 7, 1959, rests of the parties were withdrawn by agreement to stipulate some matters with reference to organization of defendant district; its election of directors; their instructions to defendant's engineer to prepare detailed plans, specifications, and cost estimates for construction of the ditch; their approval and adoption thereof; and the allowance of $9.20 to plaintiffs for a right-of-way easement, all of which has been heretofore mentioned.

On January 27, 1959, after the trial court had viewed the premises, a judgment was rendered, which found and adjudged the issues of release and estoppel in favor of plaintiffs and against defendant. It also found: (1) That plaintiffs should not be granted either preventive or mandatory relief because plaintiffs had already sustained all of the damages they will sustain, and injunctive relief would not benefit them, but would be an unnecessary burden upon defendant; (2) that the difference in value between plaintiffs' land immediately before construction of defendant's ditch and the date of the judgment, January 27, 1959, was $3,200; (3) that plaintiffs had expended $2,939 in constructing the first dam under advice of their engineer, and they were entitled to recover that sum, but should recover nothing expended for their second and third dams constructed under advice of their engineer because plaintiffs and their engineer should have known that any further attempts to prevent erosion in the creek by similar structures would be unavailing with money uselessly expended, and defendant could not be charged therewith; (4) that it was difficult to determine the amount of

plaintiffs' land washed away by erosion of the creek, but the court estimated such loss to be "one acre or slightly more," for which plaintiffs should be allowed "$275"; and (5) that the total of such items was $6,414. The judgment then denied plaintiffs any injunction, either preventive or mandatory, against defendant, and ordered that plaintiffs recover from defendant $6,414 and costs.

Therefrom plaintiffs appealed, assigning: (1) That the finding and judgment of the trial court denying plaintiffs a mandatory injunction was contrary to the evidence and law; and (2) that the finding and judgment for plaintiffs in the sum of $6,414 was contrary to the evidence and law and wholly inadequate to compensate plaintiffs under the Constitution. We sustain plaintiffs' assignments.

On the other hand, defendant cross-appealed, assigning that the trial court erred: (1) In not holding that plaintiffs were estopped to assert their cause of action against defendant; and (2) in not holding that the release executed by plaintiffs on July 13, 1950, absolved defendant from all liability for damages alleged in plaintiffs' petition. We do not sustain defendant's assignments.

In addition to the holdings in Armbruster v. Stanton-Pilger Drainage Dist., *supra,* there are other applicable and controlling authorities which should be pointed out. We reaffirmed in Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467, that: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite.

"The trial court is required to consider any competent and relevant facts revealed by a view of the premises

as evidence in the case, and a duty is imposed on this court on review of findings made by the trial court to give consideration to the fact that the trial court did view the premises; provided, that the record contains competent evidence to support the findings.

"It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstruction of all waters which may be reasonably anticipated to drain there. This is a continuing duty."

In that connection, there is no credible evidence on material questions of fact which is in irreconcilable conflict except on the question of the extent of plaintiffs' damages and the dollar amount thereof, and the issues of release and estoppel, which, as we view it, eventually became simply questions of law. Also, as hereinafter observed, the record contains no competent evidence to support some of the findings of the trial court, who viewed the premises.

Section 31-437, R. R. S. 1943, provides in part: "None of the provisions of sections 31-401 to 31-450 shall be construed as repealing or in anywise modifying the provisions of any other act relating to the subject of drainage. Nothing therein contained shall be deemed to authorize any drainage district to divert the waters of any river, creek, stream, canal or ditch from its channel to the detriment of any person or persons having any interest in such river, creek, stream, canal or ditch or the waters therein, unless proper compensation be ascertained and paid therefor under the laws of this state relating to the taking of private property for public use."

As recently as McGree v. Stanton-Pilger Drainage Dist., 164 Neb. 552, 82 N. W. 2d 798, this court held: "When land is taken outside the boundaries of the right-of-way condemned, it constitutes a second taking of private property for a public use and liability attaches therefor under Article I, section 21, of the Constitution."

In Lackaff v. Bogue, 158 Neb. 174, 62 N. W. 2d 889,

we held that: "A party seeking an injunction must establish by competent evidence every controverted fact necessary to entitle it to relief and an injunction will not lie unless the right is clear, the damage is irreparable, and a remedy at law is inadequate to prevent a failure of justice.

"Acts which destroy or result in a serious change of property either physically or in the character in which it has been held or enjoyed have been held to do an irreparable injury.

"Ordinarily where an injury wrongfully committed by one against another is continuous or is being constantly repeated so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction.

"In such cases, equity looks to the nature of the injury inflicted, together with the fact of its constant repetition or continuation, rather than to the magnitude of the damages inflicted, as the ground of affording relief." See, also, Armbruster v. Stanton-Pilger Drainage Dist., *supra*.

In Crawford v. Central Nebraska Public Power & Irr. Dist., 154 Neb. 832, 49 N. W. 2d 682, referring to damages, this court held: "The measure of damages for land taken for public use is the fair and reasonable market value of the land actually appropriated and the difference in the fair and reasonable market value of the remainder of the land before and after the taking.

"Everything which affects the market value is to be taken into consideration. The burden of additional fencing, and like matters, are to be included, not by being added together item by item, but to the extent that, taken as a whole, they detract from the market value of the property."

Also, as held in Quest v. East Omaha Drainage Dist., 155 Neb. 538, 52 N. W. 2d 417: "The words, 'or damaged,' in Article I, section 21, of the Constitution of Ne-

braska, include all actual damages resulting from the exercise of the right of eminent domain which diminish the market value of private property.

"In a suit to recover damages under the constitutional provision for damage to property for public use, it is immaterial whether the petition states a cause of action ex delicto or ex contractu. If the fact is established that property has been damaged for public use, the owner is entitled to compensation.

"Whatever reduces the market value of real estate by the injuring of it for public use may be considered in determining the just compensation to which the property owner is entitled.

"The jury in fixing the damages sustained by a landowner in consequence of the appropriation, or injury, of his property for a public use may take into account every (nonspeculative) element of annoyance and disadvantage resulting from the improvement which would influence an intending purchaser's estimate of the market value of such property." See, also, Rath v. Sanitary District No. One, 156 Neb. 444, 56 N. W. 2d 741. Of course, such rules also apply when the court fixes the damages in cases such as that at bar.

In other words, in determining the amount of plaintiffs' damages, their expenses for additional fencing, repairs, removal, and rebuilding thereof; the expenses of removal and repair of plaintiffs' private roads and bridge, together with inconvenience and disadvantage caused thereby; the expenses of repair and the threatened peril and damages to one of plaintiffs' two valuable irrigation wells, irrigation and sewer systems, and to their buildings; and the expenses incurred attempting, in good faith, to stop the erosion and damages when defendant refused to do so, and like matters, are elements to be considered, not by adding them together item by item and allowing them, or by allowing such item or items as such, but, together with the amount of plaintiffs' land taken by erosion, such elements should be

considered in determining the extent that, taken as a whole, defendant damaged plaintiffs' land by detracting from and reducing the market value thereof. In other words, the allowance of $2,939 as such to plaintiffs for money expended in building their first preventive structure in the creek was entirely erroneous and contrary to law. In such respect, Nine Mile Irr. Dist. v. State, 118 Neb. 522, 225 N. W. 679, and Peck v. Chicago Rys. Co., 270 Ill. 34, 110 N. E. 414, relied upon by plaintiffs, are entirely distinguishable from the case at bar, and not controlling herein.

Defendant, in its cross-appeal, relied upon Idlewild Farm Co. v. Elkhorn River Drainage Dist., 114 Neb. 134, 206 N. W. 741, 116 Neb. 300, 216 N. W. 817, and upon Halligan v. Elander, 147 Neb. 709, 25 N. W. 2d 13, to support its claim of estoppel. However, an examination of those opinions discloses that they are entirely distinguishable from the case at bar upon both the facts and the law.

In Kime v. Cass County, on rehearing, 71 Neb. 680, 101 N. W. 2, this court said: "We are of opinion that the spirit, if not the letter, of the constitution requires that the public seeking to appropriate private property to its use should, unless damages have been waived by some affirmative and unequivocal act, take steps of its own motion to ascertain their amount and secure their payment, and that mere passive acquiescence by an individual in the appropriation of property, unaccompanied by any conduct indicative of affirmative assent thereto, should not, unless continued for the statutory period of limitations, be regarded as a waiver of his rights."

In Sedlak v. Duda, 144 Neb. 567, 13 N. W. 2d 892, 154 A. L. R. 490, we held: "A party may not properly base a claim of estoppel in his favor on his own wrongful act or dereliction of duty, or fraud committed or participated in by him, or on acts or omissions induced by his own conduct, concealment, or representations."

Also, in George v. Guarantee Mutual Life Co., 144 Neb. 285, 13 N. W. 2d 176, dealing with estoppel, we held: "There can be no waiver, unless the person against whom it is claimed had full knowledge of his rights and of facts which will enable him to take effectual action for their enforcement. No one can acquiesce in a wrong while ignorant that it has been committed, and that the effect of his action will be to confirm it." Such authorities are controlling here on the issue of estoppel.

In that connection, during the spring and summer of 1949 there were conversations in the neighborhood by landowners, including plaintiff, with reference to the advisability of forming a drainage district to straighten the old Elkhorn River channel. A letter, dated June 20, 1949, came to plaintiffs before any legal steps were taken to form the district. It was entitled: "RE: Engineering Services in Connection with the Proposed Drainage District in the Vicinity of Stanton, Nebraska." Therein, an engineering firm offered its services in connection with preparation of preliminary plans, reports, and estimates of costs for the straightening of the Elkhorn River between Stanton and Pilger, for a distance of 5 or 6 miles if a district were formed. Therein it was proposed that the engineering fee for such preliminary services would be $500 if such services were completed within the next 60 days, but said sum was to be refunded if the drainage district were created and said engineers were subsequently employed by the directors as consulting and construction engineers. Plaintiff was one of 14 persons who signed and accepted that preliminary offer. Thereafter, on September 9, 1949, such preliminary report, addressed to "Stanton-Pilger Drainage District, Stanton, Nebraska," was furnished by the aforesaid engineers "In accordance with your instructions." Among other proposals, it recommended adoption by the district of "Pilot Channel No. 1" with a "34-foot top, 24-foot bottom, 10 feet deep."

It recited that: "A preliminary field survey has been made for the purpose of determining, 1. Approximate location of pilot channel. 2. Approximate length of pilot channel. 3. Approximate cost of pilot channel"; it then said: "A temporary committee of interested parties met in Stanton, Nebraska. The members of this temporary committee are as follows: Bert Armbruster" and seven other named persons who "have assisted us not only in selecting the temporary location of the pilot channel, but also in determining the boundaries of the district. The location of the pilot channel, as shown in the accompanying plan, is approximate only, and is subject to changes when the final survey is made * * *." Among other things, it also said: "This is a worthwhile project and we recommend its construction. If you decide to organize a drainage district, we hope that we may have the pleasure of carrying the engineering work to completion, and we will be pleased to cooperate with your attorney in furnishing the necessary enginering data required in connection with the legal procedure for forming a drainage district. * * * In the event that the election for the creating of a Drainage District carries, we would be pleased to assist your temporary committee and attorney in determining the units of benefit."

As heretofore pointed out, defendant district was thereafter legally formed by persons other than plaintiff, and such engineers were thereafter employed by the board of directors elected October 11, 1949, who thereafter approved and adopted "Pilot Channel No. 1" as presented and recommended by such engineers. Plaintiff never served as a director of the district or in any official capacity after its formation. As held in Ritter v. Drainage Dist. No. 1, 148 Neb. 873, 29 N. W. 2d 782: "The method of financing improvements and repairs of a drainage system and the plans for accomplishing the result, are ordinarily within the discretion of the board of supervisors of the district, but it must

act, and its acts must be commensurate with its legal duty."

In other words, plaintiffs took no part whatever in construction of the ditch, and they never knew that the waterfall created thereby would erode upstream and cause plaintiffs any damage until long after construction of the pilot channel. Defendant's own engineers and its board of directors did not even know that or anticipate it, as they should have done. With regard to the temporary committee aforesaid, plaintiff testified positively that he never even knew that he was on such committee until he saw the preliminary report dated September 9, 1949, and that he never met with any such committee which allegedly assisted in "selecting the temporary location of the pilot channel." In such respect, defendant's evidence conflicting therewith is equivocal, uncertain, and of doubtful credibility. We conclude that the trial court properly found in favor of plaintiffs and against defendant on the issue of estoppel. No other conclusion could be reached upon any theory.

Turning to the question of plaintiffs' alleged release of their claim for damages, defendant relies upon general rules stated in 45 Am. Jur., Release, § 14, p. 681, and § 18, p. 683, but they are not controlling here. Rather, note the exceptions appearing in such sections, and the statements appearing in § 20, p. 685, and § 22, p. 687. Defendant also relies upon Shanle v. Busch, 134 Neb. 903, 280 N. W. 174, wherein we held that: "When a party of mature age, able to read and write, being somewhat experienced in business transactions, has an opportunity to read a release, and executes the same, she is bound thereby, her defense being that she does not remember the transaction at all." However, such case is distinguishable from the case at bar.

In Cover v. Platte Valley Public Power & Irr. Dist., 162 Neb. 146, 75 N. W. 2d 661, we held: "After an easement to drain across the lands of another has been

legally acquired it is limited both as to extent and nature to the terms of the original grant.

"The rule is that if the grant of an easement or reservation is specific in its terms, it is decisive of the limits of the easement."

In Collins v. Hughes & Riddle, 134 Neb. 380, 278 N. W. 888, we held: " 'When the amount received in settlement is grossly inadequate to compensate for the injuries sustained, that fact may be considered, with other evidence, as tending to show unfair practice, that the party has been overreached, and that the minds of the parties never met in the consummation of a valid contract.' Perry v. Omaha Electric Light & Power Co., 99 Neb. 730, 157 N. W. 921.

"Where parties fairly and honestly intend to and do settle their controversy for known injuries received, but there are injuries wholly unknown to the parties, of a serious character, which are not taken into consideration, a release given in settlement of the injuries, although purporting to be a release of all damages that may thereafter accrue, will be set aside, on the ground of mutual mistake, as inequitable, unjust, and not complying with the intention of the parties." See, also, Bryant v. Greene, 164 Neb. 15, 81 N. W. 2d 580.

In Schmidt v. City of Lincoln, 151 Neb. 317, 37 N. W. 2d 500, we distinguished Collins v. Hughes & Riddle, *supra,* and held that: "General words in a release are sufficient to bar a claim which had accrued at the date of the execution of the release, or a claim known to exist by the party signing it."

Herein, plaintiffs' claim had not accrued at the date of signing the release, and they had no knowledge that then or in the future such a claim would exist. In fact, no material work had been done on the project and neither defendant's engineer nor defendant's officers had any such knowledge until plaintiffs' damage had actually occurred or was about to inevitably do so. Also, the release actually related only to a part of plaintiffs'

described 40 acres within the district, and the release never was intended by anyone to have any relation to plaintiffs' damages here involved, which subsequently occurred.

Finally, as stated in Hopper v. Elkhorn Valley Drainage Dist., 108 Neb. 550, 188 N. W. 239: "The record evidence seems to show beyond question that the defendant drainage company was grossly negligent and did not perform its duty; that plaintiff's welfare was entirely overlooked or disregarded; that approved engineering principles were not followed in the construction and maintenance of the ditches. It would be unreasonable to so construe the right of way deeds as to release all damages on account of the negligent and faulty construction or maintenance of the defendant's works. The drainage district was organized for the purpose of controlling the waters and improving the natural drainage of the land within such district, not to take waters from one section and make them overflow the lands lower down and thus destroy their usefulness and producing qualities. * * * Courts should not be asked to construe a right of way deed given for a nominal consideration into an instrument for the confiscation without remuneration of a large and valuable farm. Such could not have been the intention of the plaintiff or the meaning of the language used, and the defendant drainage district would have hardly dared, on the solicitation of such conveyances, to have so interpreted their meaning and purpose." Such statement has application here. We conclude that plaintiffs' release was not a waiver of their damages and did not estop their claim for damages.

As we view it, the remaining primary and fundamental issue here is whether plaintiffs were entitled to a mandatory injunction, and the extent and amount of plaintiffs' damages. In such respect, the evidence is voluminous and can only be summarized. There are five volumes of oral testimony and stipulations, and four

volumes of exhibits, consisting of letters, plans, surveys, proposals, agreements, and maps, together with many photographs which graphically support plaintiffs' contention that defendant had caused great, continued, continuing, and irreparable damage to plaintiffs' land.

Plaintiff was born on plaintiffs' land, where he had lived for more than 50 years. His father had lived upon the land and farmed it well many years before plaintiffs first became tenants, then acquired it in 1938. Prior to 1950, Cedar Creek was a small, useful, flowing stream except during some dry portions of the summer and when frozen over in winter. In 1950 and prior thereto, the average width of the creek from bank to bank was 25 to 28 feet and its average depth from top of the banks to its bed was 6 to 9 feet. Its banks were then sloping, grassed over, and stabilized by nature for many years, with no noticeable erosion of its bed or banks. One bend near plaintiffs' yards had been straightened by plaintiffs' father many years ago to make the creek more convenient and useful for agriculture and stockraising purposes. Plaintiffs' stock, of which there were many each year, could readily travel up and down the creek banks for watering and feeding purposes. A private bridge, 28 feet long and 14 feet wide, spanned the creek from west to east near plaintiffs' yards and buildings for convenient use in crossing the creek in plaintiffs' large-scale farming and stockraising on plaintiffs' land located on each side of the creek. Plaintiffs had private roads on each side of the creek which led to the west and east county road on plaintiffs' north line, where the creek was crossed by a county bridge. Plaintiffs' yards, feed lots, and other improvements are generally on the west side of the creek. Plaintiffs' land was greatly and expensively improved. Such improvements included a valuable modern home where plaintiffs lived, another less valuable modern home where plaintiffs' daughter and her husband lived, and two other partly modern homes where plaintiffs' hired men and their

families respectively lived. Each house had a well in it and there were several wells in the yards, together with a windmill and pump. There were numerous other valuable improvements, including barns; granaries; machine sheds; chicken houses; garages; animal sheds for cattle, hogs, and sheep; a large corn storage building with an elevator; two valuable irrigation wells with a steel flue crossing the creek to plaintiffs' land east thereof; and all land and yards were fenced hog tight. The buildings were painted and kept in good repair. Two hundred acres of plaintiffs' farm land were irrigated by gravity, with irrigation ditches, and the rest of their farm land was irrigated with a sprinkler system. Their land was generally level except some on the west side, which was gradually sloping but easily farmed. Their soil was Elkhorn River bottom land, known as "Waukesha Loam." It had been well fertilized each year, and had been highly productive. Plaintiffs' corn regularly produced from 70 to 100 bushels an acre. One year it produced 123 bushels an acre. Another year, plaintiffs produced 99 bushels an acre, for which plaintiff was cited for having produced the highest acreage in the state. Plaintiffs also owned 1,137 acres of pasture land used in connection with their large farming and stockraising projects. They yearly raised or fed several hundred head of cattle and hogs. At times they fed several hundred head of lambs.

Defendant's ditch was cut 6 feet below the bed of the creek at the point where it intersected the creek on land about 990 feet north of plaintiffs' north line. Prior thereto, the creek emptied into the Elkhorn River, about 2,200 feet north of plaintiffs' north line. The ditch was completed about November or December 1950. Early in 1952, after erosion had progressed toward plaintiffs' land and damage thereto appeared to be inevitable, a competent engineer for the State Soil Conservation Service attended a meeting called by defendant's board of directors and the county commissioners. Others were

present also, and such engineer was told that the purpose of the meeting was to find out if there was some solution which would arrest the erosion in the creek. They were told by such engineer, who had years of experience in like situations, that it was possible, and he was requested by defendant's directors and the county commissioners to make surveys and designs in order to affirm that statement. In April or May 1952, that was done by making a survey of elevations, distances, and taking profiles of the channel, and by taking cross-sections thereof at different places down the creek to the point where it emptied into the ditch. That engineer testified that he "was aghast at the development * * * at the severe development that had taken place, erosion of the banks and widening of the channel" of the creek; that the width of the creek from bank to bank was "approximately 100 feet at a certain location"; but there was "a great deal of irregularity to it" which continued "for some distance, approximately to the * * * county road"; and there was "quite a pronounced waterfall (straight up and down about 5 feet high) just below the bridge at that time" which naturally caused the erosion. As directed, such engineer prepared and subsequently presented a practical standard design of a structure to correct erosion in the creek, which he testified could be built at some proper point in the creek, and same would be effective to do the job, but if it was not done, the erosion would continue throughout plaintiffs' land, which would take a number of years. However, the county commissioners refused to cooperate in the sharing of expenses for the building of such a structure, and defendant refused to build it because it would cost between 12 and 14 thousand dollars to do so.

Thus, the erosion caused by defendant came on up through the county bridge, creating a great broad, deep hole on plaintiffs' land, and washing out one end of the county bridge, which required the county to build an 18 or 20 foot extension thereto. From there the ero-

sion moved back on plaintiffs' land for about 200 feet when, in July 1952, plaintiffs consulted with their engineer with regard to having something done at once to save any further damages. They then decided to attempt construction of a temporary piling structure. Such a structure was then built as advised, at a cost of $2,939, and it served effectively from August 1952 until a heavy rain in July 1953, when the water went over the piling and washed out around it, at one end. In March 1953, while that structure was still intact, plaintiffs' engineer returned to make a survey of the creek and the effect of erosion that had taken place. At that time there had been marked increase in erosion, with the waterfall still farther up stream, which caused a further steepening and widening of the banks of the creek, and which was and would continue throughout plaintiffs' land until stabilized. Plaintiffs' engineer testified it was and is practical and feasible for defendant to have built or to build a standard structure in the creek, and that such construction would stop the erosion. After the first structure washed out, and as advised by their engineers, plaintiffs repaired, increased, and widened the piling at a cost of $2,100, but it washed out again around the end after a heavy rain. Thereafter, upon advice of their engineer, plaintiffs pulled out the piling and moved the structure 500 or 600 feet up stream and replaced it above the waterfall at a cost of $1,330, but it also washed out and the piling was removed. The admitted total reasonable cost of building the three structures, including engineering services, grading, and pulling the piling, was $7,267.74. Thereafter, plaintiffs abandoned any further effort to stop the erosion, and defendant refused to make any effort to do so, although plaintiffs offered to permit that to be done on their land.

Defendant's employed engineer testified that the district plans were made with the intentional idea that the ditch would cut through the creek below its bed,

and he anticipated that there would be created about a 6-foot waterfall at point of intersection. He saw the waterfall about 10 or 12 days after the intersecting of the creek. The first time he saw the erosion on plaintiffs' land was in December 1955, at which time the waterfall was about 6 feet high. The creek was about 100 feet wide in some places, and he "didn't anticipate (erosion) doing what it had done." He "never dreamed of it" and "never expected (it) to do that." He testified that the erosion was then upstream about 800 feet from plaintiffs' north line, and the plaintiffs could anticipate that the waterfall would continue eroding throughout their land at about the same height over several years' time. About 2 acres of land had washed out in December 1955, computed on the banks of the stream about 100 feet wide for a distance of 800 feet, and if the stream averaged that much through the entire distance of nearly 4,000 feet, the number of acres eventually taken from plaintiffs' land could be readily approximated by computation. He testified that a practical and efficient standard structure could have been built 300 or 400 feet back from the point of intersection, which would have stopped the erosion, but such a structure was not talked over with the district board of directors before the creek was intersected because such erosion was never anticipated, although he knew that the extent of natural erosion of waterfalls in such cases depended upon the type of soil and other factors for which no test was made. He testified that it was not beyond the capability of engineers to build a structure in the creek which would then stop the erosion, but that it would cost 12 or 14 thousand dollars, and such structure would not be feasible because of the cost of construction. However, as we view it, that would be no excuse for defendant's failure to perform its duty and build such a structure. Defendant's engineer was called by plaintiffs out of order in the first trial, and was called by defendant as its first witness in the second trial.

At the first trial, plaintiff, his brother, and other witnesses who were familiar with plaintiffs' land and had observed the creek for many years, described in detail the erosion on plaintiffs' land from 1952 when it approached the county bridge then entered plaintiffs' land. They testified that the erosion was continuing and in their opinion would continue in the future. They described tree roots that had never been exposed before in the banks and bed of the creek; large trees falling in the creek or about to do so; and great holes washed in the bed and banks which were vertical and caving in, when before they were sloping and grassed over. They described extensive erosion to plaintiffs' private bridge; the erosion coming within a few feet of plaintiffs' irrigation well; plaintiffs' washed-out road and fences west of the creek; and plaintiffs' washed-out irrigation ditches east of the creek, all of which erosion and damages had not existed prior to 1950.

Plaintiff testified in detail about being required to repair, add to, and extend one end of his private bridge where it had washed out; that he rebuilt and regraveled his private road on the west side of the creek two or three times because it had washed out; and that he moved his fences along the creek several times where it had eroded out at various places. He described the washing and eroding of the creek into his farm land on both sides; the banks eroding closer to one of his tenant houses and hog barn and into his feed yards; the washouts imperiling his irrigation well, flume, and sewer pipes; the washing out of his irrigation ditches and crops on the east side; the continuous deepening of the creek channel and the vertical steepening and widening of its banks; the inability of his stock to reach the stream for watering purposes; and the uprooting of large trees with some of which he tried to protect his land by rip-rapping the creek. He testified that in some places the creek was 100 feet wide, and that the banks were vertical and as much as 20 to 31 feet from bank to bed.

In that connection, one of plaintiffs' witnesses testified that the creek "looked like a canyon." Another testified that he "saw something that he didn't ever realize could happen, that it would erode like that." In support of the foregoing evidence, plaintiffs offered in evidence numerous photographs and other exhibits which graphically described the great amount of erosion which witnesses could not adequately describe. In that connection, defendant adduced some evidence that the erosion was only natural and would have occurred in any event, and that the creek was stabilizing or was stabilized, but a great preponderance of the evidence is otherwise, and the photographs and other evidence entirely refute such evidence.

At the second trial in December 1958, plaintiff testified that since September 1956, the water had washed larger holes, going farther up into his fields, and the waterfall had eroded up the creek 587 feet farther, which would make a total of 1,387 feet of erosion, or less than half way through plaintiffs' land. In other words, the creek had then eroded 1,387 feet over a period of 6 years, and if the erosion continued at the same rate it would take about 7 more years to travel and erode the rest of the distance through plaintiffs' land. One hole washed out in the creek during last July was 170 feet 4 inches wide, 20 feet 6 inches deep, and 94 feet long, and was only 23½ feet from one of plaintiffs' sheds. There was another large hole back of that where water came down the creek 21 feet 5 inches wide, leaving the banks straight up and down with 16 feet to the bottom of the creek. The banks of the creek were continually dropping off and the stream was widening and approaching one of plaintiffs' sheds and tenant houses. Plaintiffs had moved the north fence back along the creek about a year ago because the creek had caved under the fence, and last July it washed out under the fence quite a ways, so plaintiffs were required to take up the fence and quit using that yard. A year ago last July plain-

tiffs took out their private bridge for fear of its loss, which was threatened because the creek was getting deeper and wider. The material taken from the bridge was useable, but it took 5½ days to remove the bridge at plaintiffs' expense, and with the bridge unuseable or out, plaintiffs had been and were put to the inconvenience and expense of driving 1.6 miles farther around to cross the county bridge to their land east of the creek, and come back to their yards again. In that connection, several photographs offered in evidence by plaintiffs and defendant also graphically supported the foregoing evidence.

Here it should be said that plaintiffs also showed expenses of several hundred dollars for new piling for their private bridge, its repair, extension, and abutment, and ultimate removal; moving and rebuilding fences; repairing, rebuilding, regrading, and regraveling their washed-out private road west of the creek; repairing and reconstructing their irrigation ditches washed out on the east side of the creek; and riprapping and otherwise protecting plaintiffs' sewer line, irrigation flume, and items of that nature.

Plaintiff also testified that prior to 1950, plaintiffs' land had a value of $325 an acre, but on December 22, 1958, it had a value of $170 to $175 an acre. A witness for plaintiffs, a farmer and landowner who had known plaintiffs' land all of his life and was familiar with their improvements, methods of farming, irrigation, and soil, testified that in 1950 plaintiffs' land was worth $300 an acre, but was worth $200 an acre in November 1956.

Another comparable witness for plaintiffs testified that in 1950, plaintiffs' land was worth $300 an acre, but in November 1956 it was worth $150 to $175 an acre, without taking into consideration plaintiffs' expenses in attempting to protect their land from erosion.

Another comparable witness for plaintiffs, who was licensed to sell real estate and had done soil conservation work several years, had inspected plaintiffs' land

and the creek with its erosion thereof, and had taken some pictures thereof, testified that in 1950 plaintiffs' land as irrigated was worth $300 an acre, but in November 1956 its value would be about $200 an acre, although in August 1952 it was worth about $225 to $250 an acre.

A witness for defendant, who was not an engineer but was employed by the county agricultural stabilization and conservation service committee, testified that plaintiffs' land had been substantially eroded and that by the use of a planimeter, measured on an aerial photograph taken August 1, 1957, he had computed that at that time 2.1 acres had eroded into the creek.

Another witness for defendant, who had been a member of its board of directors until April 1957, admitted that by erosion "the creek has widened, and deepened," but that the difference in the value of plaintiffs' land before and after the erosion "would be the land that went into the creek." That the creek "is stabilizing" and that "at present there is no damage to (plaintiffs') buildings, yet," but "if the creek continues in the way it is there will be."

Another witness for defendant, who was a member of its board, admitted that he knew about the erosion from the beginning and its coming up on plaintiffs' land, but the extent of plaintiffs' damages "would be the amount of land that has been taken by this erosion * * * I would say five or six acres," together with "a certain amount of inconvenience as to getting to his fields to farm them * * *."

Another witness for defendant, who was a member of defendant's board, admitted that he knew about the erosion of plaintiffs' land. When he went out there at different times, he saw plaintiffs' old bridge and "enough erosion had taken place that the piling, looked to me like, were standing on the bottom of the creek." He admitted "that the damaged claimed" in his opinion "would be the number of acres that were taken away

by erosion, plus a very small amount for inconvenience, traveling around." That he "wouldn't have any way of knowing the actual number of acres" but thought that "four to five acres * * * would be fair." His opinion was that the value of the land that went into the creek was not as "high as $300.00 an acre * * * I will put it at $250.00"; that "$250.00 * * * would be putting it high then, especially land along the creek bank"; that "$250.00 was a high figure on that land on the east side" and that "it would be still less on the west side"; and if the land taken "is five acres, two and a half acres on" each side "the damage" is land "That fell in the creek * * * $875.00."

Another witness for defendant, who was a member of defendant's board, admitted that he had been acquainted with the erosion to plaintiffs' land right along. He testified, "Well, about all the way you can fix that damage is what the erosion has taken in the land; and the creek was there originally, and figure that in. My estimate of land taken is between two and two and a half acres," and that plaintiffs' added inconvenience without the bridge would be insignificant with modern machinery and made no difference in the value of the land. He admitted that the waterfall had then eroded up to only about 100 feet north of plaintiffs' feed yard.

A Norfolk real estate broker examined plaintiffs' land a few days before the trial at the request of defendant's attorney, in order to determine plaintiffs' damages by erosion and testified for defendant with regard thereto. To a degree he examined the erosion and testified that plaintiffs' land before erosion "would have had a market value *on today's values* of $225.00 an acre * * * That is $72,000.00 total." (Italics supplied.) After the erosion occurred, his opinion was, "Well, on the basis of other farms with similar erosion and creeks going through that, my experience in seeing them, I determined that this was of not any damage or difference to the value of the farm, that the farm would admittedly

bring at this time $215.00 per acre or a difference of $10.00, a total of $3,200.00 less." He admittedly was not familiar with plaintiffs' land or the creek prior to 1950 and before the ditch was dug through said creek. Upon examination before the trial, he admitted seeing the waterfall and knew that such waterfall had a tendency to work backward and deepen the stream, and he had observed that they did so, but he had reason to believe that the fall in the creek would not do so "if ordinary precautions are taken to eliminate that, which most people would do to protect their property." He admittedly did not know that plaintiffs had spent some $7,000 trying to do so, and did not take that into consideration as an element in fixing his "values or damages in any respect." He had heard that plaintiffs had been compelled to move their fences two or three times because they had been washed out, and he did take that into consideration, but did not take into consideration that plaintiffs might have to do so in the future. He admitted there was evidence of some riprapping in the nature of trees left along the banks of the stream; that he saw some big holes as he walked along the stream; but did not take into consideration that there might be additional holes washing in the stream. He didn't know that before the erosion plaintiffs had a private bridge for convenient access from their buildings to land east of the creek, or that such bridge had washed out, so he did not take that element into consideration in fixing the value of plaintiffs' land. He would have considered such private bridge a convenience and of some value, dependent upon its condition, which should have been added to his value of $225 an acre before the erosion.

In that connection, no witnesses for defendant, except two as heretofore set forth, made any effort whatever to testify as to the money value of plaintiffs' land lost by erosion or the value of plaintiffs' other land either before or after the erosion. On the other hand, the testimony adduced by plaintiffs with regard thereto

must be considered in the light of the entire record considered de novo.

The evidence in this case is overwhelming that defendant's actions have caused plaintiffs great and irreparable damage; that the creek has not stabilized and will not be stabilized for several years; that the erosion and damages are continuing and will continue over a period of years throughout plaintiffs' land unless a preventative structure is built by defendant to prevent further erosion and damages; that such a structure is standard practice and effective to stop the erosion and damages; and that plaintiffs should be granted a mandatory injunction requiring defendant to build such a structure. There is no competent evidence whatever which could upon any theory support the trial court's conclusion that "plaintiffs have already sustained all of the damages that they will sustain because of the acts of the defendant district and such injunctive relief would not benefit them but would be an unnecessary burden upon the defendant district." Also, the allowance to plaintiffs of $2,939 as an item of expense for construction of their first piling dam to prevent further erosion was erroneous, and there was no competent evidence which could support the trial court's conclusion that plaintiffs had lost only "one acre or slightly more" of their land. In that connection, the minimum thereof admittedly was 2.1 acres as of August 1, 1957, almost 1½ years before conclusion of the trial, and at the trial four of defendant's directors respectively admitted that as of December 1958, plaintiffs had lost 5 or 6 acres, 4 or 5 acres, between 2 and 2½ acres, and 5 acres, being 2½ acres on each side of the creek. Further, the allowance of $3,200 by the trial court as the difference in the value of plaintiffs' land before and after the erosion was supported by but one witness for defendant who had never seen plaintiffs' land and fixed his 1950 values "on today's values," and who, having failed to consider several elements heretofore

pointed out, admitted that if he had, the amount of $3,200 as damages should have been more.

We conclude that the fair and reasonable market value of plaintiffs' land on and prior to 1950 was $250 an acre, and that as of December 23, 1958, the date when the new trial was concluded, plaintiffs' land had a fair and reasonable market value of $215 an acre. We conclude that plaintiffs' loss from erosion caused by defendant was at least 5 acres as of December 23, 1958, for which plaintiffs are entitled to recover $250 an acre, or a total of $1,250 therefor. We likewise conclude that as of December 23, 1958, plaintiffs are entitled to recover the difference between $250 and $215, or $35 an acre for 314 acres, or a total of $10,990 therefor. In other words, we conclude that as of December 23, 1958, plaintiffs are entitled to recover damages in the total sum of $12,240, and that they should be awarded a mandatory injunction as prayed.

Therefore, we reverse the judgment of the trial court and remand the cause with directions to render judgment in favor of plaintiffs and against defendant in strict accord with this opinion. All costs are taxed to defendant.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., not participating.